# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**MARSHA A. SHOEMAKER,**

           **Petitioner,**

**v.**

**SHERI DUFFY,**

           **Respondent.**

**CASE NO. 2:08--564**
**JUDGE WATSON**
**MAGISTRATE JUDGE KEMP**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. This matter is before the Court on the instant petition, respondent's Return of Writ, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

## FACTS and PROCEDURAL HISTORY

The Ohio Third District Court of Appeals summarized the facts and procedural history of this case as follows:

> In November of 2005, the Union County Grand Jury indicted Shoemaker on one count of deception to obtain a dangerous drug in violation of R.C. 2925.22(A), a felony of the fourth degree; one count of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(1),(C)(1)(c), a felony of the third degree; one count of involuntary manslaughter in violation of R.C. 2903.04(A), a felony of the first degree; one count of aggravated possession of drugs in violation of R.C. 2925.11(A),(C)(1)(b), a felony of the third degree; and, one count of complicity to aggravated possession of drugs in violation of R.C. 2925.11(A),(C)(1)(b), a felony of the third degree. At her arraignment, Shoemaker entered a plea of not guilty to all five counts in the indictment.

In March of 2006, a jury trial was held. At the trial, the following testimony was heard.

Chance Runyon testified that he had a party at his parents' house on July 1, 2005, while his parents were vacationing in Montana. Chance noted that Justin Phelps attended the party with approximately ten to fifteen other people. Chance continued that when Justin arrived at his parents' house, he had a twelve pack of beer, some marijuana, and an orange pill bottle, which Justin said contained Percocet and Xanax, with him. Chance testified that Justin had also informed him that he was trying to get morphine prior to the party, but Justin did not state where or from whom he was going to try to obtain the morphine.

Christopher Shoemaker, Shoemaker's son, who also was at Chance's party, testified that the first time he saw Justin at the party, Justin was drinking beer. Christopher continued that later in the evening, he saw Justin with marijuana and pills. Christopher noted that he smoked marijuana with Justin and that Justin had given him morphine pills, which were blue and white; however, he refused to take the morphine pills. Additionally, Christopher testified that he saw Justin take a morphine pill and a Percocet pill. Christopher noted that when he left the party, Justin appeared to be "pretty buzzed up" and "was intoxicated", but did not notice anything physically wrong with him. (Trial Tr. p. 98).

Gordy Wolfe was also called to testify. Mr. Wolfe testified that on July 1, 2005, Justin had stopped by his home to pick up a CD and that Justin had told him that he was going to try morphine at Chance's party, but he did not ask Justin about where or from whom he was going to obtain the morphine.

Ashton Kidd, who was at Chance's party from approximately 9:30 p.m. to 1:00 a.m., testified that at the party, he saw Justin with purple and white pills, which Justin told him contained morphine, but he did not know where Justin obtained the pills. Mr. Kidd also testified that Justin had offered him some of the pills, which Justin had in a bag that contained approximately twenty to thirty pills.

Kyle Emmens, who was also at Chance's party, testified that he saw Justin with a bottle of pills, which contained blue and white pills; that he saw Justin take two of the blue and white pills but did not know how many or what kind of pills Justin took; and, that he saw Justin drinking alcohol.

David Wampler, who is Chance's neighbor and attended the party, testified that he saw Justin with purple and white pills, which Justin stated were morphine, but noted that Justin did not tell him where, when, or how he obtained the morphine pills. Mr. Wampler also testified that he did not see Justin take any of the pills; however, Mr. Wampler did recognize that in his written statement to police, he indicated that he saw Justin take one or two of the purple and white pills.

Lindsey Webb, who had previously dated Justin for approximately three years and attended Chance's party, testified that when she arrived at the party, "[Justin] was drinking, obviously. He had a beer in his hand, but other than that, he wasn't slurring no (Sic.) words or incoherent or anything." (Trial Tr. p. 191). Ms. Webb also noted that she stayed with Justin that night and went to bed at around 4:00 to 4:30 a.m., and agreed that Justin's condition showed that "he had been drinking but [didn't] appear to be overly intoxicated." (Trial Tr. p. 192).

Ms. Webb testified that at around 9:30 a.m. on July 2, 2005, she was woken up by Chance, who was yelling at Justin to wake him up. Ms. Webb continued that at this point, Justin was snoring and described his snoring as "loud." (Trial Tr. p. 193). Ms. Webb also noted that she did not pay any attention to whether Justin was making breathing sounds and went back to sleep.

Chance testified that on the morning of July 2, 2005, at around 10:00 a.m., Justin was found having difficulty breathing; that he was unable to find Justin's pulse; that Justin "didn't really look like he was breathing"; that Justin's "lips were kind of purple"; that Ms. Webb, who also spent the night at Chance's house, called 9-1-1 and later, he talked to the dispatcher; and,

that Adam Slack, who did not spend the night at his parents' house, commenced CPR on Justin before medics arrived. (Trial Tr. p. 154).

Deputy Tina Perry, the 9-1-1 dispatcher at the Madison County Sheriff's department who received Ms. Webb's call, testified that she dispatched medics and Deputy Brent Michael to the scene.

Deputy Michael, a deputy sheriff with the Madison County Sheriff's Department, testified that Justin's yellow Aztec was parked outside of the residence and that when he got to the residence, medics were already working on Justin.

Dr. Victor Trianfo, the assistant director of emergency services at Memorial Hospital of Union County, testified that he was serving in the emergency room on July 2, 2005, when Justin was admitted into the emergency department of Memorial Hospital. Dr. Trianfo stated that on Justin's arrival to the emergency room, CPR had already been instituted and that "[Justin's] condition was quite grave." (Trial Tr. p. 164). Dr. Trianfo indicated that after eleven minutes of resuscitative efforts, the efforts were discontinued.

Dr. Trianfo also testified that he had taken blood specimens from Justin's body that included both THC, which is more commonly known as marijuana, and opiates. Dr. Trianfo continued that morphine was a class of opiate and that the drug screen performed on Justin's blood would have picked up morphine. Dr. Trianfo also stated that "[Justin's] condition upon presentation was consistent with a drug overdose, and, indeed, that was my diagnosis and impression at the time I saw him." (Trial Tr. p. 168).

On cross-examination, Dr. Trianfo stated, with regards to the test performed on Justin's blood, that "morphine and all of its congeners [and] [m]edications such as Percocet [and] Percodan could also be found in the system under the general classifications of opiates." (Trial Tr. p. 173-74).

On recross-examination, Dr. Trianfo confirmed that the test on

Justin's blood indicated that there was a presence of an opiate, but did not distinguish which opiate was in his blood.

Dr. David Applegate, the Union County Coroner, testified that he conducted an investigation into the death of Justin Phelps. Dr. Applegate stated that he had Justin's body transported to the Licking County Coroner's Office, where an autopsy of Justin's body was completed, because his office did not have the facilities to complete a forensic autopsy. Additionally, Dr. Applegate testified that he reviewed all of the materials from the Licking County Coroner's Office and had extensive discussions with Detective Justice and the Union County Sheriff's Office in making his determination.

After reviewing his coroner's report, Dr. Applegate testified that he determined with a preponderance of the evidence that Justin died because of an accidental acute morphine overdose. Dr. Applegate continued that he based his determination on the toxicology and timing of Justin's death and that his determination was made with a reasonable degree of medical certainty. Dr. Applegate also stated that small beads found inside Avinza capsules were found in Justin's esophagus and stomach contents. Dr. Applegate continued that alcohol will typically speed up the release of Avinza and helped lead to a sudden overdose. Dr. Applegate also testified that Justin had metabolites of marijuana and low levels of "Oxycodone, which can be with the [trade] names of Percocet, Percodan, [and] Endocet * * *." (Trial Tr. p. 301). Dr. Applegate concluded that neither Oxycodone nor marijuana was a contributing factor to Justin's death.

Dr. Applegate also testified about how an overdose of morphine affects a person's body. Dr. Applegate noted that a high level dose of morphine can suppress "the breathing mechanism and that's what we felt caused the death in Justin." Dr. Applegate also stated that brain swelling and frothing of the airways are found in victims of morphine overdoses, which they found in Justin's body.

After being asked by the jury, Dr. Applegate testified that he believed Justin died between 6:00 and 9:00 on the morning of

July 2, 2005. Additionally, Dr. Applegate noted that his belief was inconsistent with the witnesses who found Justin snoring and that "[he] did not believe that [Justin] had been alive just an hour or two before he presented Sic. to the emergency department." (Trial Tr. p. 323).

Dr. Charles Lee, the chief forensic pathologist and a deputy coroner at the Licking County Coroner's Office in Newark, Ohio, testified that he performed the autopsy on Justin's body on July 4, 2005. Dr. Lee noted that Justin's body was very healthy and normal, except that his brain was swollen and his lungs were very heavy and filled with fluid. Additionally, Dr. Lee stated that he found little white balls, which are found in a time released medication, in the uppermost portion of Justin's airway and in Justin's gastrointestinal tract. Dr. Lee also indicated that Justin's toxicology report showed that his blood had approximately seven to eight times the level of the therapeutic range of morphine. Finally, Dr. Lee concluded that his opinion with a reasonable degree of medical certainty was that Justin died of acute morphine overdose.

On cross-examination, Dr. Lee noted that Justin's case was "the highest level I've ever seen of morphine in a death." (Trial Tr. p. 342). Additionally, Dr. Lee stated that he did not analyze the little white balls found in Justin's body.

Sergeant Eric Semler, with the Madison County Sheriff's Office investigation division and assigned to the Drug Enforcement Administration, federal task force, testified that on the morning of July 2, 2005, he was called out to Chance's parents' residence for an investigation. Sergeant Semler noted that when he arrived at the scene, Justin had already been transported to the hospital. Sergeant Semler continued that Chance had informed him that he believed that Justin had smoked "a little marijuana" and that he thought "[Justin] had maybe taken some morphine tablets." (Trial Tr. p. 67). Sergeant Semler testified that after he received this information from Chance, he had Deputy Michael inform the Union County Memorial Hospital.

Sergeant Semler and Deputy Michael participated in the

inventory of Justin's vehicle, which was located at Chance's parents' house. Both Sergeant Semler and Deputy Michael noted that inside the vehicle a plastic bag containing blue and white capsules and other drug paraphernalia were found. Sergeant Semler continued that these items were submitted to the Bureau of Criminal Identification and Investigation (hereinafter referred to as "BCI"), and Deputy Michael noted that these items were seized as evidence. Sergeant Semler also indicated that he obtained Justin's cell phone, some cash, and a pack of cigarettes.

Erica Reed, a forensic chemist at BCI, identified the items Sergeant Semler submitted to BCI. Ms. Reed testified that the items included a clear plastic bag containing 121.20 grams of marijuana, a clear plastic bag containing nineteen blue and white capsules of morphine, thirteen white tablets of Oxycodone, three blue tablets of Alprazolam, one white tablet of Hydrocodone, and six tablets of Lorazepam.

Christopher Shoemaker also testified that he gave a statement to Detective Justice on July 5, 2005. Christopher stated that he told Detective Justice that Justin had morphine and that his mother, Shoemaker, had been prescribed morphine for back pain. Christopher continued that his mother also occasionally used marijuana; however, he did not know everyone she got it from. Christopher testified that Justin told him that he had given his mother marijuana. Christopher also noted that he had heard conversations between his mother and Justin, during which Justin wanted to trade marijuana for morphine. Christopher also noted that he knew that Justin and his mother were exchanging marijuana for morphine and that he was present for one discussion of an exchange, but never actually witnessed an exchange take place.

On cross-examination, Christopher testified that he heard that Justin had more pills than just the Percocet and morphine, but only saw Justin with those two types of pills. Christopher also testified that Shoemaker kept her morphine in her room or in her medicine cabinet; however, the morphine was not locked up.

On redirect examination, Christopher stated that he was between a rock and a hard place because his friend was dead and his mother provided him with the drugs. Additionally, Christopher confirmed that he told Detective Justice that his mother was providing Justin with morphine in exchange for marijuana.

Dr. Scott Murray, Shoemaker's physician, testified that she had come to his office for the first time in February of 2003. Dr. Murray continued that at this visit, Shoemaker noted that she had a lower back injury in 1999 while working cleaning houses. Dr. Murray noted that Shoemaker had undergone surgery in 2002 and 2004 for her lower back. Dr. Murray indicated that between 2003 and 2004, he treated Shoemaker's condition with therapy, antiinflammatory medications, and some other medications to lower her muscle pain.

Dr. Murray stated that he prescribed Shoemaker 60-milligram Avinza capsules, a long-acting morphine medication, for the first time in February of 2005. Dr. Murray also noted that he refilled her prescription for 60-milligram Avinza capsules in March and April of 2005. Dr. Murray continued that in May of 2005, he increased Shoemaker's Avinza dosage from 60-milligrams to 90-milligrams and that in June of 2005, he increased Shoemaker's Avinza dosage from 90-milligrams to 120-milligrams.

Karen Yee, a pharmacist at Kroger in Marysville, Ohio, testified that Kroger did not fill any prescriptions of 60-milligram Avinza for Shoemaker during June of 2005, but did fill Shoemaker's prescription for thirty capsules of 120 milligram Avinza on June 15, 2005, the same date Dr. Murray ordered the prescription. Ms. Yee also indicated that Shoemaker had signed a signature log indicating that she had picked up the prescription.

Ms. Yee also described the physical difference between the various milligram pills of Avinza. Ms. Yee stated that 120-milligram Avinza is blue on one side and white on the other side. Additionally, Ms. Yee identified the pills found in Justin's vehicle as Avinza 120-milligram capsules.

Dr. Murray also testified that "[Avinza] is different than most of the others in that it releases ten percent of the medication when the patient first takes it and spreads the rest of medication (Sic.) out over the course of 24 hours" (Trial Tr. p. 219) and that "a peak concentration of the medicine would be approximately six hours after the patient took the [Avinza capsule]." (Trial Tr. p. 220).

Dr. Murray also described his procedure before prescribing a patient medicine. Dr. Murray testified that he had his patients read over and sign a pain medication agreement in his office. Dr. Murray also indicated that Shoemaker signed a pain medication agreement in March of 2003.

Dr. Murray testified that within the pain medication agreement, the third paragraph read "I will not use any illegal controlled substances, including marijuana, cocaine, etcetera." (Trial Tr. p. 204). Dr. Murray also confirmed that if one of his patients were using marijuana or cocaine, it would cause him concern and would be something that he would consider before proscribing opiate narcotics. Dr. Murray noted that if someone used marijuana, it "lets [him] know that they have connections to the illegal drug market and so they are at risk; there certainly needs to be considerations on what medications I might feel comfortable for prescribing for them." (Trial Tr. p. 205).

Dr. Murray also stated that paragraph four of the pain medication agreement provided "I will not share, sell, or trade my medications with anyone." (Trial Tr. p. 205). Dr. Murray continued that "[d]iverting medications is one of the big concerns I have as a physician regarding the controlled pain medications, not wanting them to be taken by anyone other than the patient for the safety of people-other people in the community as well as the patient." (Trial Tr. p. 206). Additionally, Dr. Murray stated that if he found out that one of his patients was using marijuana, "[he couldn't] think of a condition where [he] wouldn't stop prescribing medications, controlled substances, to that patient and [would] most likely discharge them from [his] practice." (Trial Tr. p. 206).

Dr. Murray also testified that the seventh paragraph of the pain medication agreement provided, "I agree that I will use my medication at a rate no greater than the prescribed rate, and that the use of my medication at a greater rate will result in my being out of medication for a period of time." (Trial Tr. p. 207). Dr. Murray, describing the importance of this paragraph, stated "[w]hen I prescribe a medication to someone, that is the dose that I feel is appropriate for them at that time. A greater quantity of medication might be harmful to them, but it also may indicate that they don't have control over their ability to take the medication." (Trial Tr. p. 207).

Dr. Murray testified that the ninth paragraph of the pain medication agreement provided, "I agree to use only one pharmacy to fill my pain medication prescription." (Trial Tr. p. 207). Dr. Murray, describing the importance of this paragraph, stated "[i]t's very difficult to keep track of * * * prescriptions that are filled by patients. One of the ways that it decreases the work I have to do and my medical staff has to do is have only one pharmacy where each patient fills the prescriptions." (Trial Tr. p. 207).

Dr. Murray continued that the fifteenth paragraph of the pain medication agreement provided, "I understand that if I break this agreement my doctor will no longer prescribe controlled substances for me, and he may choose to no longer be my treating physician after 30 days of notification and my records will be forwarded to any physician I select for further care." (Trial Tr. p. 208).

Dr. Murray then confirmed that Shoemaker had never informed him that she had been using marijuana during the course of her treatment; that Shoemaker had never advised him that she had traded, sold, or shared her medication with anyone; that Shoemaker had never informed him that she had used more than one pharmacy to fill a pain medication prescription; and, that at times, Shoemaker used her medicine at a rate greater than the prescribed rate. Dr. Murray also indicated that on July 19, 2005, Shoemaker had informed him that she had taken twice her prescribed dosage of Avinza, during some days prior to her last appointment and had run

out on July 5, 2005, when her prescription should have run out on July 15, 2005.

On cross-examination, Dr. Murray noted that while treating Shoemaker, he never questioned the legitimacy of her injury or pain; that he never felt deceived by Shoemaker; and, that there "were no red flags that made [him] think that [Shoemaker] was doing other (Sic.) than taking the medications as prescribed." (Trial Tr. p. 236).

Deanna Miracle, the payroll administrator at Fresh Encounter, the parent company of Community Markets in Marysville, Ohio, testified that Shoemaker was an employee of Community Markets and that Shoemaker came to work on July 1, 2005, but did not come to work on July 2, 2005.

Detective Michael Justice of the Union County Sheriff's Office testified that he and Sergeant Semler performed a joint investigation on this case. Detective Justice noted that as part of the investigation he received Justin's cell phone from Justin's father and had talked to Christopher Shoemaker. Detective Justice also stated that he obtained the cell phone records from Justin's phone, which included a phone call received from a pay phone at Community Markets at 1:52 p.m., on July 1, 2005.

Detective Justice also stated that he applied for a search warrant to conduct a search on Shoemaker's home, which the Marysville Municipal Court authorized. Detective Justice testified that he executed the search warrant on July 6, 2005. Detective Justice stated that while executing the search warrant and during a conversation with Shoemaker and her husband, Shoemaker affirmed that she received a prescription for Avinza on June 15, 2005. Additionally, Detective Justice stated that when he asked Shoemaker whether she had that prescription or if she had traded it with Justin, she denied that there was a trade. Detective Justice continued that Shoemaker had told him, without examining the pill bottle, that she was out of Avinza and that she had been taking two a day. Detective Justice also testified that he obtained a Kroger prescription bottle for thirty Avinza 120-milligram capsules for Shoemaker, but the bottle was empty. Detective Justice

continued that after executing the search warrant on Shoemaker's residence, he and Sergeant Semler took Shoemaker to Memorial Hospital of Union County to take hair, blood, and urine samples from Shoemaker to determine whether Shoemaker had a presence or absence of morphine in her system.

Detective Justice also testified that he investigated pharmacies in Union County and noted that Shoemaker was the only person between January 1 and July 2, 2005 to obtain a 120-milligram Avinza prescription.

Detective Justice also reviewed Shoemaker's Grand Jury testimony, wherein she stated that she did not tell Dr. Murray that she had been using marijuana to help with pain; that she had double dosed her Avinza 120-milligram capsules because she hurt so bad; that she also double dosed on her Avinza 90-milligram capsules; that she had acquired marijuana from Justin; that she and Justin had discussed trading drugs for marijuana; that she did not know if anyone had stolen her pills, because she never counted them nor kept track of them; and, that she called Justin on July 1, 2005 to acquire some marijuana because she was out, but Justin did not have any. Additionally, Detective Justice noted that when asked "is your testimony under oath that you took every one of those Avinza 120s", Shoemaker responded "No." (Trial Tr. p. 396).

Dr. Laureen Marinette, the chief forensic toxicologist at the Montgomery County Coroner's Office and the Miami Valley Regional Crime Lab, testified that she reviewed and performed the toxicology studies on Shoemaker's blood and urine samples. Dr. Marinette indicated that the reports provided that a marijuana metabolite was found in Shoemaker's blood and urine samples; that the parent marijuana drug was found in her blood sample; that Amitriptyline, which is commonly known as Elavil, and Amitriptyline's metabolite Nortripyline were detected in her urine and blood samples; that diphenhydramine, which is commonly known as Benadryl, and Tramadol were found in the blood and urine samples. Dr. Marinette stated that morphine typically takes a couple of days to fall below the threshold for detection in a urine sample and

up to a day for a blood sample depending on the dosage. Dr. Marineete also testified that tests were conducted on Shoemaker's blood and urine samples to detect morphine, but the tests did not detect morphine in either of her samples.

David Englehart, the lab director at Omega Laboratories in Mogadore, Ohio, testified that Omega Laboratories performed the hair testing on Shoemaker's hair sample. Mr. Englehart stated that the laboratory received Shoemaker's sample on August 24, 2005 and was taken from Shoemaker on July 6, 2005. Mr. Englehart testified that test results looking for morphine on Shoemaker's hair came back negative and that approximately seven to ten days after someone takes morphine, it should appear in that person's hair. Additionally, Mr. Englehart stated that Shoemaker's hair sample would provide results for ninety days of hair growth. Mr. Englehart added that when the laboratory completed further tests on Shoemaker's hair sample, the results showed that there was no morphine in her hair.

Mr. Englehart then testified that he received a second hair sample from Detective Justice on December 27, 2005 that was collected from Shoemaker on November 16, 2005, which would allow the laboratory to look back approximately one-hundred eighty days. Mr. Englehart testified that after the tests were performed on this hair sample, the results were positive for marijuana and opiates. Mr. Englehart continued that a confirmatory study was performed on this sample and that there was no morphine found within the one-hundred eighty day time period. Mr. Englehart also confirmed that if Shoemaker had been taking 120- or 90-milligram Avinza when she said that she was, Shoemaker's hair would have shown that she had actually consumed morphine.

Detective Justice also testified that Shoemaker was unable to offer an explanation as to why there was no morphine in her system; that she only saw Justin when she needed marijuana, which was about once a month; and, that she recognized that her doubling up on morphine would have been a violation of her pain agreement with Dr. Murray.

At the conclusion of the State's case-in-chief, Shoemaker moved under Crim.R. 29 for judgment of acquittal on all five counts of the indictment. The trial court granted the motion as to the count of aggravated possession of drugs, but overruled the motion on the other four counts.

Shoemaker did not present any witnesses or put on any evidence.

At the conclusion of the trial, a jury found Shoemaker guilty of one count of deception to obtain a dangerous drug in violation of R.C. 2925.22(A), a felony of the fourth degree; one count of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(1),(C)(1)(c), a felony of the third degree; one count of involuntary manslaughter in violation of R.C. 2903.04(A), a felony of the first degree; and, one count of complicity to aggravated possession of drugs in violation of R.C. 2925.11(A),(C)(1)(b), a felony of the third degree. The trial court also found that the offense of complicity to aggravated possession of drugs was an allied offense of aggravated trafficking in drugs, and the State elected to have Shoemaker sentenced on the aggravated trafficking offense.

Subsequently, the trial court sentenced Shoemaker to twelve months in prison on the count of deception to obtain a dangerous drug, five years in prison on the count of aggravated trafficking in drugs, and eight years in prison on the count of involuntary manslaughter, all to be served consecutively. The trial court also ordered Shoemaker to pay fines, costs, and restitution and credited her with one-hundred fifteen days of jail credit.

*State v. Shoemaker*, 2006 WL 2796280 (Ohio App. 3rd Dist. October 2, 2006).  Petitioner filed

a timely appeal, in which she asserted the following assignments of error:

Assignment of Error No. I

THE TRIAL COURT ERRED WHEN IT FAILED TO GRANT APPELLANT'S CRIMINAL RULE 29 MOTION OF

ACQUITTAL ON THE COUNT OF INVOLUNTARY MANSLAUGHTER, AS THE EVIDENCE PRESENTED WAS INSUFFICIENT TO SUSTAIN A GUILTY VERDICT.

Assignment of Error No. II

THE TRIAL COURT ERRED WHEN IT FAILED TO GRANT APPELLANT'S CRIMINAL RULE 29 MOTION FOR ACQUITTAL ON THE COUNT OF DECEPTION TO OBTAIN DANGEROUS DRUGS.

*See id.*  On October 2, 2006, the appellate court affirmed the judgment of the trial court.  *Id.*

Still represented by counsel, petitioner filed a timely appeal to the Ohio Supreme Court.

She asserted the following propositions of law:

1. Drug trafficking cannot serve as the predicate offense for involuntary manslaughter, when the decedent suffered a drug overdose, and the defendant did not control the quantity or variety of drugs that the decedent ingested....

2.  Ms. Shoemaker is serving an unconstitutional sentence. *Bouie v. City of Columbia* (1964), 378 U.S. 347...; *Miller v. Florida* (1987), 482 U.S. 423....

3.  The Ohio Revised Code, in its current state, does not authorize consecutive prison terms.

4.  Appellate counsel provides ineffective assistance when counsel fails to raise the issue of an illegal sentence.

*Exhibit 12 to Return of Writ.*  On March 14, 2007, the Ohio Supreme Court dismissed the appeal.  *State v. Shoemaker,* 113 Ohio St.3d 1414 (2007).

On September 8, 2008, petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254.  She alleges that she is in the custody of the respondent in

violation of the Constitution of the United States based upon the following grounds:

> 1. Marsha Shoemaker was denied her rights to due process and a fair trial, guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, when there was insufficient evidence to support her convictions.

> 2. Marsha Shoemaker is serving an unconstitutional sentence.

It is the position of the respondent that petitioner's claims are procedurally defaulted.

## PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration. 28 U.S.C. §2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.;Anderson v. Harless,* 459 U.S. 4, 6 (1982) (*per curiam; Picard v. Connor*, 404 U.S. 270, 275-76 (1971). If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982);*Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state

procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id*. Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id*. Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id*. Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id*. This "cause and prejudice" analysis also applies to failure to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir.1985).

In claim one, petitioner asserts that the evidence was constitutionally insufficient evidence to sustain her convictions. However, on direct appeal, petitioner asserted solely that the evidence was constitutionally insufficient to sustain her convictions on involuntary manslaughter and deception to obtain dangerous drugs. *See Exhibit 8 to Return of Writ.* Further, in her subsequent appeal to the Ohio Supreme Court, petitioner asserted solely that she had been improperly convicted of involuntary manslaughter. *Exhibit 12 to Return of Writ.*[1] Petitioner may now no longer present additional claims of insufficiency of the

---

[1] Specifically, petitioner asserted that "Drug trafficking cannot serve as the predicate offense for involuntary manslaughter, when the decedent suffered a drug overdose, and the defendant did not control the quantity or variety of drugs that the

evidence to the state courts under Ohio's doctrine of *res judicata*. *State v. Cole*, 2 Ohio St.3d 112 (1982); *State v. Ishmail*, 67 Ohio St.2d 16 (1981); *State v. Perry*, 10 Ohio St.2d 175 (1967). The state courts were never given the opportunity to enforce the procedural rule at issue due to the nature of petitioner's procedural default.

In claim two, petitioner asserts that she was illegally sentenced under Ohio law to three consecutive terms of incarceration after *State v. Foster*, 109 Ohio St.3d 1 (2006). She also appears to contend that her sentence violates the Ex Post Facto Clause. *See Petition.* These claims, being readily apparent from the face of the record, likewise should have been raised on direct appeal, but were not. Again, petitioner may now no longer present such claims to the state courts under Ohio's doctrine of *res judicata*. *State v. Cole*, supra; *State v. Ishmail, supra; State v. Perry, supra*.

Petitioner first challenged her sentence as improperly and unconstitutionally imposed on appeal to the Ohio Supreme Court; however, the Ohio Supreme Court does not ordinarily consider claims not first raised in the appellate court below, and petitioner did not thereby properly preserve this claim for federal habeas corpus review. *See Mitts v. Bagley*, 2005 WL 2416929 (N.D. Ohio September 29, 2005)(habeas petitioner's failure to raise a claim in the Ohio Court of Appeals precludes review by the Supreme Court of

---

decedent ingested." *See Exhibit 12 to Return of Writ.* Respondent contends that petitioner thereby has waived her claim of insufficiency of the evidence on the involuntary manslaughter conviction; however, review of the record reflects that petitioner framed her insufficiency of evidence argument in this same manner before the Ohio Court of Appeals, which addressed the merits of this claim. *See State v. Shoemaker, supra.* Therefore, this Court likewise will consider the merits of this claim.

Ohio), citing *Fornash v. Marshall*, 686 F.2d 1179, 1185 n.7 (6th Cir. 1982)(citing *State v. Phillips*, 27 Ohio St.2d 294, 302 (1971)).

The Court must next decide whether the procedural rules at issue constitute an adequate and independent bases upon which to foreclose review of the petitioner's federal constitutional claims. This task requires the Court to balance the state's interests behind each procedural rule against the federal interest in reviewing federal claims. *See Maupin v. Smith*, 785 F.2d at 138. The Court of Appeals for the Sixth Circuit has consistently held that Ohio's doctrine of *res judicata, i.e.,* the *Perry* rule, is an adequate ground for denying federal habeas relief. *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir.2006); *Coleman v. Mitchell*, 268 F.3d 417, 427-29 (6th Cir.2001); *Seymour v. Walker,* 224 F.3d 542, 555 (6th Cir.2000); *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir.2000); *Norris v. Schotten,* 146 F.3d 314, 332 (6th Cir.1998). The doctrine of *res judicata* is stated in unmistakable terms in countless Ohio decisions, and Ohio courts have consistently refused, in reliance on that doctrine, to review the merits of claims. *See State v. Cole, supra; State v. Ishmail, supra.* Further, the doctrine of *res judicata* serves the state's interest in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. With respect to the independence prong, the Court concludes that *res judicata* does not rely on or otherwise implicate federal law. The third part of the *Maupin* test has been met.

Thus, petitioner has waived her right to present her claims of insufficiency of evidence as it relates to all of her convictions except her conviction on involuntary manslaughter, and her claim that she was unconstitutionally sentenced. She may still

obtain review of these claims on the merits if she establishes cause for her procedural defaults, as well as actual prejudice from the alleged constitutional violations. Petitioner has failed to establish cause for her procedural default of her insufficiency of the evidence claims in claim one.

The Court presumes that petitioner asserts the ineffective assistance of counsel as cause for her procedural default of claim two. *See Edwards v. Carpenter*, 529 U.S. 446, 451052 (2000)(the ineffective assistance of counsel may constitute cause for a procedural default, so long as such claim has been presented to the state courts and is not, itself, procedurally defaulted). Petitioner asserted, in her appeal to the Ohio Supreme Court, that she had been denied the effective assistance of appellate counsel because her attorney failed to raise a claim on appeal that her sentence had been unconstitutionally imposed. *See Exhibit 12 to Return of Writ.* Such claim, therefore, may constitute cause for the procedural default of her claim that her sentence violates the Ex Post Facto Clause.

Nonetheless, petitioner has failed to establish cause for this procedural default, as her ineffective assistance of appellate counsel claim lacks merit.

The right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). The standard for demonstrating a claim of ineffective assistance of counsel is composed of two parts:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance

> prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland,* 466 U.S. at 687. Scrutiny of defense counsel's performance must be "highly deferential." *Id*. at 689.

With respect to the first prong of the *Strickland* test, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id* . To establish the second prong of the *Strickland* test, prejudice, a Petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because Petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, should the court determine that Petitioner has failed to satisfy one prong, it need not consider the other. *Id.* at 697.

The *Strickland* test applies to appellate counsel. *Burger v. Kemp*, 483 U.S. 776, 781-82 (1987). Counsel must provide reasonable professional judgment in presenting the appeal. *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985). " '[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). *But see Smith v. Anderson*, 104 F.Supp.2d 773, 839 (S.D.Ohio 2000) ("This Court believes that, in capital cases, appellate

counsel should approach the traditional process of winnowing out claims with extreme caution."); *Jamison v. Collins*, 100 F.Supp.2d 647, 740-41 (S.D.Ohio 2000) ("[W]e believe that any 'winnowing' or narrowing of issues must be done very cautiously when a person's life is at stake."). The Court of Appeals for the Sixth Circuit has identified the following considerations that ought to be taken into account in determining whether counsel on direct appeal performed reasonably competently:

1. Were the omitted issues "significant and obvious?"

2. Was there arguably contrary authority on the omitted issues?

3. Were the omitted issues clearly stronger than those presented?

4. Were the omitted issues objected to at trial?

5. Were the trial court's rulings subject to deference on appeal?

6. Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

7. What was appellate counsel's level of experience and expertise?

8. Did the Petitioner and appellate counsel meet and go over possible issues?

9. Is there evidence that counsel reviewed all the facts?

10. Were the omitted issues dealt with in other assignments of error?

11. Was the decision to omit an issue an unreasonable one

which only an incompetent attorney would adopt?

*Mapes v. Coyle*, 171 F.3d 408, 427-28 (6th Cir.1999). This list is not exhaustive and need not produce a certain "score." *Id.* at 428.

The trial court sentenced petitioner on March 22, 2006, and after the Ohio Supreme Court's decision in *Foster,* excising fact-finding provisions of Ohio sentencing statutes as unconstitutional under *Blakely.  Foster, supra*, 109 Ohio St.3d at 1.  *See Exhibit 6 to Return of Writ.*  Therefore, the trial court was free to impose more than minimum and consecutive terms of incarceration without violating *Blakely.*  Further, the United States Supreme Court has held that imposition of consecutive terms of incarceration does not violate the Sixth Amendment.  *Oregon v. Ice*, – U.S. –, 129 S.Ct. 711, 714-15 (2009).  Additionally, this Court is not aware of any Court that has not rejected petitioner's contention that her sentence violated the Ex Post Facto Clause.  *See Schaub v. Brunsman*, 2009 WL 2143746 at *5-6 (N.D. Ohio July 16, 2009):

> Ex Post Facto Clause challenges to the BookerFN3 decision have been repeatedly denied by the federal courts. *United States v. Barton*, 455 F.3d 649, 657 (6th Cir.2006), cert. denied, 549 U.S. 1087, 127 S.Ct. 748, 166 L.Ed.2d 579 (2006); *United States v. Davenport*, 455 F.3d 366 (4th Cir.2006); *United States v. Austin*, 432 F.3d 598, 599-600 (5th Cir.2005); *United States v. Vaughn*, 430 F.3d 518 (2nd Cir.2005), cert. denied, 547 U.S. 1060, 126 S.Ct. 1665, 164 L.Ed.2d 405 (2006); *United States v. Perez-Ruiz*, 421 F.3d 11 (1st Cir.2005), cert. denied, 546 U.S. 1120, 126 S.Ct. 1092, 163 L.Ed.2d 907 (2006); *United States v. Dupas,* 419 F.3d 916, (9th Cir.2005), cert. denied, 547 U.S. 1011, 126 S.Ct. 1484, 164 L.Ed.2d 261 (2006); *United States v. Jamison,* 416 F.3d 538 (7th Cir.2005) ("Jamison also had fair warning that distributing cocaine base was punishable by a prison term of up to twenty years, as spelled out in the United States Code.

Jamison had sufficient warning of the possible consequences of his actions, and his sentence does not run afoul of any of the core concepts discussed in *Rogers*." )

FN3. Significant in light of the fact that the *Foster* and *Booker* decisions employed similar rationales to craft similar remedies.

Notably, Ex Post Facto challenges similar to that raised by the petitioner have been rejected by judges in this district. *Watkins v. Williams*, Case No. 3:07CV 1296 (N.D.Ohio June 17, 2008) (J. Adams) (The *Foster* decision did not violate due process as it did not alter the fact that the defendant was well aware of the maximum penalty he faced at the time of his crime.); *Lyles v. Jeffreys*, Case No. 3:07CV1315 (N.D.Ohio April 24, 2008) (J. Oliver) (The trial court's re-sentencing did not violate petitioner's Due Process right not to be re-sentenced pursuant to a law which violates the Ex Post Facto Clause, as petitioner "had fair notice of the acts that were prohibited and the degree of punishment which the Ohio legislature wished to impose on those who committed those acts."); *McGhee v. Konteh*, Case No. 1:07CV1408 (N.D.Ohio Feb.1, 2008) (J. Nugent) (Affirming Magistrate Judge Limbert's conclusion that "Since the Foster decision does not change the elements necessary to convict Petitioner or the potential maximum sentence that Petitioner faced for a first degree felony, *Foster* does not raise an ex post facto-type due process violation. Moreover, the trial judge's application of *Foster* to Petitioner's case in particular did not violate *Apprendi* because he did not sentence Petitioner beyond the statutory maximum.")

The appellate court rejected petitioner's challenges to his sentence, holding in pertinent part:

We note that the issues contained in appellant's five assignments of error have recently been raised and rejected by this court in numerous prior decisions of this court. *See State v. Green*, 11th Dist. Nos.2005-A-0069 and 2005-A-0070, 2006-Ohio-6695; *State v. Elswick*, 11th Dist. No.2006-L-075, 2006-Ohio-7011; *State v. Asbury*, 11th Dist. No.2006-L-097, 2007-Ohio-1073; *State v. Anderson*, 11th Dist. No.2006-L-142, 2007-Ohio-1062; *State v. Spicuzza*, 11th Dist. No.2006-L-141,

2007-Ohio-783.

> These same arguments have also been consistently rejected by other Ohio appellate districts and federal courts. *See State v. Gibson*, 10th Dist. No. 06AP-509, 2006-Ohio-6899; *State v. Moore,* 3d Dist. No. 1-06-51, 2006-Ohio-6860; *United States v. Portillo-Quezada* (C.A.10 2006), 469 F.3d 1345, 1354-1356, and the cases cited therein.

*Id.* Therefore, petitioner cannot establish prejudice from her attorney's failure to raise such an issue on direct appeal. She likewise has failed to establish cause for her procedural default.

Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. at 491; *see also Sawyer v. Whitley*, 505 U.S. 333. After review of the record, the Court does not deem this to be such a case.

## CLAIM ONE

In claim one, petitioner asserts that the evidence was constitutionally insufficient to sustain her conviction on involuntary manslaughter. The state appellate court rejected this claim as follows:

> Shoemaker argues that her conviction on the count of involuntary manslaughter was not supported by sufficient credible evidence and that the trial court erred in denying her Crim.R. 29 motion for acquittal. Specifically, Shoemaker contends that she cannot be found guilty of involuntary manslaughter, because her conviction for trafficking in drugs in violation of R.C. 2925.03(A)(1),(C)(1)(c), a felony of the third degree, cannot serve as the predicate felony offense of

25

involuntary manslaughter. Basically, Shoemaker asserts that her drug trafficking conviction cannot be the proximate cause of Justin's death.

The Ohio Revised Code defines the offense of involuntary manslaughter in R.C. 2903.04. R.C. 2903.04 provides, in pertinent part:

(A) No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony.

In the case *sub judice*, Shoemaker argues that as a matter of law trafficking in drugs cannot be the predicate offense of involuntary manslaughter, because "[t]he State did not prove, beyond a reasonable doubt that while committing the offense of trafficking in drugs, [she] was the proximate cause of [Justin's] death." (Appellant's brief p. 4).

A description of the history of R.C. 2903.04 can be found in the Tenth District's decision of *State v. Losey* (1985), 23 Ohio App.3d 93, 94-95. Within its *Losey* decision, the Tenth District described what the Legislature intended in its use of "proximate result" under R.C. 2903.04, as follows:

Under [R.C. 2903.04], defendant cannot be held responsible for consequences no reasonable person could expect to follow from his conduct; he will be held responsible for consequences which are direct, normal, and reasonably inevitable-as opposed to extraordinary or surprising-when viewed in the light of ordinary experience. In this sense, then, "proximate result" bears a resemblance to the concept of "proximate cause" in that defendant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of the risk created by his conduct. *State v. Chambers* (1977), 53 Ohio App.2d 266, 373 N.E.2d 393 [7 O.O.3d 326]. Here, that means that death reasonably could be anticipated by an ordinarily prudent person as likely to result under these or similar circumstances. *See State v. Nosis* (1969), 22 Ohio App.2d 16, 457 N.E.2d 414 [51 O.O.2d 15].

*Id.* at 95.

In addition, the State had the burden to prove that Shoemaker caused Justin's death, and that the death proximately resulted from Shoemaker's commission of any felony, in this case, trafficking in drugs. *See State v. Morris*, 105 Ohio App.3d 552, 556.

In the case *sub judice*, Shoemaker does not dispute her conviction of trafficking in drugs in violation of R.C. 2925.03(A)(1),(C)(1)(c), a felony of the third degree. However, Shoemaker argues that Justin's death could not be the proximate result of her trafficking in drugs conviction. We disagree.

On the evidence presented in this case, reasonable minds could readily have concluded at the close of the State's case that Justin's death was proximately caused by Shoemaker giving her Avinza pills to Justin. Dr. Murray, Shoemaker's treating physician, testified that he had prescribed Shoemaker 120-milligram Avinza tablets for back pain on June 15, 2005. Karen Yee, a pharmacist at Kroger in Marysville, Ohio, testified that Kroger filled Shoemaker's prescription for thirty 120-milligram Avinza capsules on June 15, 2005; that 120-milligram Avinza capsules are blue on one side and white on the other side; and that the pills found in Justin's vehicle, which was found outside of Chance Runyon's parents' house, were 120-milligram Avinza capsules. Deanna Miracle testified that Shoemaker was an employee of Community Markets in Marysville, Ohio and came to work on July 1, 2005. Additionally, Detective Michael Justice testified that Justin's cell phone records included a phone call received from a pay phone at Community Markets on July 1, 2005. Further, Christopher Shoemaker, Shoemaker's son, testified that he knew that Justin and his mother were exchanging marijuana for morphine, but that he never actually witnessed an exchange take place. Christopher also testified that he saw Justin take a blue and white morphine pill at Chance's party on July 1, 2005. Also, two other witnesses testified that they saw Justin take blue and white pills, which Justin stated contained morphine, at Chance's party. Dr. Applegate, the Union County

Coroner, testified that Justin's esophagus and stomach contained small beads found in Avinza capsules and that based upon a reasonable degree of medical certainty and with a preponderance of the evidence, Justin died of an accidental acute morphine overdose. Viewing the evidence in a light most favorable to the State, Justin's death, resulting from a morphine overdose, could have reasonably been anticipated by an ordinarily prudent person as likely to result from Shoemaker's trafficking in morphine, *see State v. Baksi*, 11th Dist. No. 98-T-0123, (The Eleventh District upheld a trial court's denial of a Crim.R. 29 motion on an involuntary manslaughter offense, where the defendant was convicted of trafficking in drugs for supplying the victim with heroin, which caused the victim's death.), and that any rational trier of fact could have found the essential elements of R.C. 2903.04(A) proven beyond a reasonable doubt. Accordingly, Shoemaker's first assignment of error is overruled.

*State v. Shoemaker, supra*, 2006 WL 2796280. The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. 2254(e)(1) provides:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Further, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence that was presented. 28 U.S.C. 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the

adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The United States District Court for the Western District of Michigan has summarized this standard as follows:

> [A] decision of the state court is "contrary to" such clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id.* at 413. A state court decision will be deemed an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* A federal habeas court may not find a state court's adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* Further, the federal habeas court should not transform the inquiry into a subjective one by inquiring whether all reasonable jurists would agree that the application by the state court was unreasonable. *Id*

*Williams v. Lavigne*, 2006 WL 2524220 (W.D. Michigan August 30, 2006), citing *Williams v. Taylor*, 529 U.S. 362 (2000). Petitioner has failed to meet this standard here.

Before a criminal defendant can be convicted consistent with the United States Constitution, there must be sufficient evidence to justify a reasonable trier of fact to find

guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). To determine whether the evidence was sufficient to support a conviction, this Court must view the evidence in the light most favorable to the prosecution. *Wright v. West*, 505 U.S. 277, 296 (1992)(citing *Jackson*, at 319). The prosecution is not affirmatively required to "rule out every hypothesis except that of guilt." *Id*. (quoting *Jackson*, at 326). "[A] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."' *Id*. (quoting *Jackson*, at 326).

Petitioner argues that her conviction on drug trafficking cannot support the involuntary manslaughter conviction because she had no control over the amount or quantity of drugs that Justin Phelps consumed before he overdosed on morphine, she was not with him when he took the pills, and or because other people may have intervened to prevent his death. *See Exhibit 8 to Return of Writ*.

However, Ohio courts have repeatedly rejected similar arguments. For example, in *State v. Marshall*, 175 Ohio App.3d 488, 503 (Ohio App. 1st Dist. March 7, 2008), Ohio's First District Court of Appeals affirmed an involuntary manslaughter conviction based on the predicate offense of trafficking in drugs where the victim had been shot and killed during the course of a drug deal, stating:

> To establish the offense of involuntary manslaughter, the state
> was required to establish that Marshall had caused Sublett's
> death as a proximate result of his commission of or attempt to

commit the felony of trafficking in drugs....

Marshall argues that Sublett died as a proximate result of his own criminal behavior, and, thus, that Sublett did not die as the proximate result of Marshall's drug trafficking. He also argues that the state failed to prove that Sublett's death was reasonably foreseeable, because Marshall did not know that he was going to be robbed.

Marshall misinterprets the standard for proximate result, which, as used in the involuntary-manslaughter statute, is equivalent to proximate cause.[FN3] The proximate-cause element is satisfied when the accused sets in motion a sequence of events that makes the death of another a " 'direct, proximate, and reasonably inevitable consequence.' "[FN4] Only a reasonably unforeseeable intervening cause will absolve one of criminal liability in this context.[FN5]

FN3. *State v. Robinson*, 1st Dist. No. C-060434, 2007-Ohio-2388, 2007 WL 1452590, at ¶ 25.

FN4. *State v. Lovelace* (1999), 137 Ohio App.3d 206, 215, 738 N.E.2d 418, quoting *State v. Chambers* (1977), 53 Ohio App.2d 266, 272-273, 7 O.O.3d 326, 373 N.E.2d 393.

FN5. *Id*. at 215-220, 738 N.E.2d 418.

To establish proximate causation, the state presented evidence that the death of Sublett would not have occurred that evening if Marshall had not set up the drug transaction and that drug transactions were dangerous endeavors that could often lead to robbery or even deadly violence. Marshall's own testimony corroborated testimony from several state's witnesses on the dangers associated with drug transactions. ... [T]his evidence was sufficient to establish proximate cause.

*Id.* In *State v. Baski*, 1999 WL 1299297 (Ohio App. 11th Dist. December 23, 2009), Ohio's

Eleventh District Court of Appeals similarly affirmed the involuntary manslaughter

conviction of a prisoner who had provided another inmate with morphine, from which that

inmate later overdosed and died, and rejecting the defendant's argument that he was

entitled to a jury instruction on intervening cause, stating:

> Appellant was guilty of involuntary manslaughter if he was found guilty of either trafficking or corrupting another with drugs, and that conduct caused the victim's death. The victim's voluntary injection of the heroin can not be an independent intervening cause absolving appellant of criminal liability

*Id.* *See also State v. Uselton,* 2004 WL 1059505 (Ohio App. 5th Dist. May 12, 2004), affirming

the involuntary manslaughter conviction of a defendant who sold Xanax to victims who

were later killed in a car accident:

> [A]ppellant could have legally foreseen the deaths of Howell and Roberts. Appellant knew the decedents were driving to Mansfield to purchase more Xanax, he knew they took the tablets he sold them previously, he knew their condition when they were at the apartment for the second purchase, and he knew when they left they would be driving, as he claims he told them not to drive. Most importantly, appellant knew the effects of Xanax from his personal experience in taking the drug. He himself admitted it made him reckless and unaware of how "messed up" he was. He himself had been in two accidents while under the influence of Xanax. Based upon the above, it is clear appellant knew the decedents had taken the drugs and were "messed up" at the time he sold them additional tablets. He knew they were driving to purchase the additional tablets. From his own experience, he knew driving under the influence of Xanax could result in serious physical harm or death.
>
> Appellant could have reasonably anticipated death to be a likely result of his actions. In other words, ordinary experience made it foreseeable appellant's illegal actions would likely cause the death of the decedents, Adam Howell and Mike Roberts.

*Id.* *See also State v. Wilson,* 182 Ohio App. 3d 171 (Ohio App. 8th Dist. April 9, 2009),

affirming the involuntary manslaughter conviction of a defendant who was involved in a shoot-out during a drug transaction that caused the death of a twelve year old girl walking home from school, although the defendant did not fire the bullet that killed her:

> Wilson's sole argument is that he should have not been convicted of involuntary manslaughter because he was not the cause of Thomas's death. He argues that Yhonquea was the sole cause of Thomas's death because the forensic evidence proved that it was a bullet from Yhonquea's gun that struck and killed Thomas.
>
> In *State v. Robinson* (1994), 98 Ohio App.3d 560, 574, 649 N.E.2d 18, quoting *State v. Chambers* (1977), 53 Ohio App.2d 266, 272-273, 7 O.O.3d 326, 373 N.E.2d 393, we stated:
>
> " 'Having found that the Ohio legislature intended to adopt the proximate cause theory of criminal liability, as to R.C. 2903.04, we hold that when a person, acting individually or in concert with another, sets in motion a sequence of events, the foreseeable consequences of which were known or should have been known to him at the time, he is criminally liable for the direct, proximate and reasonably inevitable consequences of death resulting from his original criminal act.' See, also, *State v. Younger* (May 31, 1990), Cuyahoga App. No. 57080 [1990 WL 71529]."
>
> A defendant cannot be held responsible for consequences that no reasonable person could expect to follow from his conduct, but he will be held responsible for consequences that are direct, normal, and reasonably inevitable when viewed in the light of ordinary experience. *State v. Losey* (1985), 23 Ohio App.3d 93, 95, 23 OBR 158, 491 N.E.2d 379. It is not necessary that the defendant "be in a position to foresee the precise consequence of his conduct; only that the consequence be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by his conduct." Id. at 96, 23 OBR 158, 491 N.E.2d 379.
>
> Only a reasonably unforeseeable intervening cause will

absolve one of criminal liability in this context. *State v. Lovelace* (1999), 137 Ohio App.3d 206, 215, 738 N.E.2d 418. "[W]hen the result varied from the harmed intended or hazarded, it must be determined that the result achieved was not so extraordinary or surprising that it would be simply unfair to hold the defendant criminally responsible for something so unforeseeable." Id. at 216, 738 N.E.2d 418, citing LaFave & Scott, Criminal Law (1972), Section 35, 246.

In *State v. Ervin*, Cuyahoga App. No. 87333, 2006-Ohio-4498, 2006 WL 2507563, ¶ 25, quoting *State v. Dixon* (Feb. 8, 2002), Montgomery App. No. 18582, 2002 WL 191582, *5, we stated:

"Under the 'proximate cause theory,' it is irrelevant whether the killer was the defendant, an accomplice, or some third party such as the victim of the underlying felony or a police officer. Neither does the guilt or innocence of the person killed matter. [A] Defendant can be held criminally responsible for the killing regardless of the identity of the person killed or the identity of the person whose act directly caused the death, so long as the death is the 'proximate result' of Defendant's conduct in committing the underlying felony offense; that is, a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience."

*See also Chambers*, 53 Ohio App.2d 266, 7 O.O.3d 326, 373 N.E.2d 393; *Moore v. Wyrick* (C.A.8, 1985), 766 F.2d 1253; *State v. Bumgardner* (Aug. 21, 1998), Greene App. No. 97-CA-103, 1998 WL 892120.

... [T]he underlying felonies in this case were predicated upon drug trafficking and having a weapon while under a disability. To establish proximate causation, the state presented evidence that Thomas's death would not have occurred that evening if Wilson had not been armed and selling drugs. As courts have acknowledged, drug transactions are dangerous endeavors that can often lead to robbery or deadly violence. *State v. Marshall*, 175 Ohio App.3d 488, 2008-Ohio-955, 887 N.E.2d 1227.

*Id.*

Similarly, here, as discussed by the state appellate court, petitioner, by giving Phelps the Avinza morphine pills, set into motion the sequence of events, i.e., Phelps' morphine overdose, that was a reasonably foreseeable and direct consequence of her drug trafficking. The Court notes that the state's expert witness ruled out other drugs as a contributing factor in Phelps' death. *See State v. Shoemaker, supra.* Further, *State v. Alicie*, 2005 WL 856939 (Ohio App. 5th Dist. April 13, 2005), referred to by petitioner, *see Exhibit 8 to Return of Writ,* does not appear to support her argument that a drug trafficking conviction cannot constitute the predicate offense for an involuntary manslaughter conviction. In that case, evidence indicated that the cause of death was "exposure to cocaine"; however, the defendant was acquitted of trafficking in cocaine, and found guilty of trafficking in heroin as he had provided heroin to the victim. *See id.*

Therefore, for all the foregoing reasons, and for the reasons detailed by the state appellate court, this Court cannot conclude that the state appellate court's decision rejecting petitioner's claim that, when viewing all of the evidence in the light most favorable to the prosecution, *see Jackson v. Virginia, supra*, the evidence was constitutionally sufficient to sustain her involuntary manslaughter conviction, warrants federal habeas corpus relief. *See* 28 U.S.C. 2254(d); *Williams v. Taylor, supra.*

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

If any party objects to this *Report and Recommendation*, that party may, within

fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985);*United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

/s/ Terence P. Kemp
United States Magistrate Judge